***NOT FOR PUBLICATION***

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| TERRI FENNIMORE,<br><br>    Plaintiff,<br><br>v.<br><br>PARTYLITE GIFTS, INC. and PARTYLITE WORLDWIDE, LLC,<br><br>    Defendants. | Civil Action No. 19-15176 (FLW)<br><br>**OPINION** |

**WOLFSON, Chief Judge:**

In this age discrimination suit, Plaintiff Terri Fennimore ("Plaintiff" or "Fennimore"), alleges that Defendants PartyLite Gifts, Inc. and PartyLite Worldwide, LLC ("Defendants" or "PartyLite") discriminated against her on the basis of her age, in violation of the New Jersey Law Against Discrimination, N.J.S.A. § 10:5-3, *et seq.* ("NJLAD"), and that Defendants' conduct constituted breach of implied contract. Specifically, Fennimore claims that agents of PartyLite influenced and interfered with one of its consultant's decisions to select a retirement designate to the detriment of Plaintiff. Defendants now move for summary judgment pursuant to Fed. R. Civ. P. 56. For the reasons set forth below, Defendants' motion for summary judgment is **GRANTED**.

**I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

The following facts are undisputed, unless otherwise noted. PartyLite manufactures and supplies candles and other home fragrance and décor products. Def. SOMF ¶ 1. Plaintiff markets and sells PartyLite products as a consultant[1] under a direct selling model. *Id.* at ¶ 2. Consultants

---

[1]  The parties agree that consultants are not employees, but rather independent contractors. Def. SOMF ¶ 3.

hold parties or other events whereby potential customers can experience and purchase PartyLite's products. *Id.* at ¶ 4. Consultants are compensated on both their personal sales and the sales of other consultants who they recruit to the business under a commission schedule. *Id.* at ¶ 5. Thus, consultants can increase their profits by developing customers, as well as recruiting and developing other consultants as part of their team. *Id.* at ¶ 6.

Plaintiff began working with PartyLite in 1985, and in 1988, she became a Unit Leader. *Id.* at ¶ 12.[2] Two years later, in 1990, Plaintiff recruited Lorraine Ricca ("Ricca") to become a consultant for PartyLite. *Id.* at ¶ 9. Ricca quickly advanced through the PartyLite leadership steps, moving from Unit Leader to Senior Regional Vice President ("SRVP") in approximately four years, and because Plaintiff recruited Ricca, she received a percentage of Ricca's sales based on her own leadership level. *Id.* at ¶¶ 11 and 13. Plaintiff, herself, became a Senior Unit Leader in 1991, Group Leader in 1992, District Leader in 1993, Regional Leader in 1995, and Senior Regional Vice President in 1996. *Id.* at ¶ 12. Thereafter, Fennimore was reclassified[3] several times between 1996 and September 2017, at which time she became a Regional Leader. *Id.*

In late July 2017, after approximately twenty-seven years working as a PartyLite consultant, Ricca decided to retire. *Id.* at ¶ 14. As an SRVP, however, Ricca had the opportunity to transition her team and book of business (also known as "lineage") to a "Designee" of her choice in accordance with PartyLite's SRVP Transition Plan ("Transition Plan"). *Id.* at ¶¶ 18-20; Pl. SOMF ¶¶ 2-8. The Transition Plan, which provides that the retiring SRVP may "select a

---

[2] With Unit Leader being the lowest level and Senior Regional Vice President being the highest level, Consultants advance in the following steps: Unit Leader, Senior Unit Leader, Group Leader, District Leader, Regional Leader, Regional Vice President, and Senior Regional Vice President. Def. SOMF ¶ 10.

[3] Defendants characterize this downward reclassification as a "demotion," a term that Plaintiff disputes. *See* Pl. Responsive SOMF ¶ 12.

designated leader to lead his/her lineage," affords financial benefits to both the retiring SRVP and the Designee over the course of a ten-year transition period. Pl. SOMF ¶¶ 1 and 8. During the first year of the Transition Plan, the retiring SRVP earns 80% of the lineage's sales while the Designee earns 20%. *Id.* at ¶ 1. These percentages then gradually decrease over the course of the remaining nine years of the Transition Plan, with the SRVP receiving 60% in the second year, 50% in the third year, 40% in the fourth year, and 30% in years five through ten. *Id.* The Transition Plan specifies that to be eligible for Designee-status, the consultant must (1) be a current Leader, (2) have signed a Leader Agreement with PartyLite, (3) be an active PartyLite Leader for three consecutive years prior to his or her approval and acceptance into the Transition Plan by PartyLite, (4) have held the title of Regional Leader, or higher, during the three years prior to his or her approval and acceptance into the Transition Plan, and (5) be actively involved in his or her business and be in good standing with PartyLite. *Id.* at ¶ 3. Once the retiring SRVP selects her Designee, PartyLite must approve the decision through a process which includes, at a minimum, an interview, a review of "downline and upline lineage," and company sanctioned training and business involvement. *Id.* at ¶ 10.

On August 2, 2017, Ricca confirmed her decision to end her consultancy and inquired about the transition process during a telephone call with PartyLite's Vice President of Sales, Tracy Graham ("Graham"), and PartyLite's Manager of Sales Compensation, Policy and Analysis, Rachel Kane ("Kane"). Def. SOMF ¶ 29. At this time, Ricci communicated that Plaintiff was her choice for Designee because (1) Fennimore was her friend, (2) Fennimore brought Ricca into the business twenty-seven years earlier, (3) Fennimore was the only other leader she knew of in New Jersey, (4) Ricca's team knew and respected Fennimore, and (5) Fennimore's account was in good

3

standing with PartyLite. *Id.* at ¶ 30; Pl. SOMF ¶¶ 20 and 24. Indeed, in an email to Graham and Kane following their telephone call, Ricca wrote:

> It is important that my Team have someone whom they know, trust and respect. If there is anything else you need from me, just let me know. I am hoping you will consider Terri Fennimore for this.

Pl. SOMF ¶ 28; *see also* Certification of Richard M. Schall, Esq. in Opp. to Def. Motion for Summary Judgment ("Schall Cert."), Ex. 4, August 2, 2017 Email. The parties agree, however, that at that time, Ricca did not have access to, or any knowledge of, Fennimore's performance as a consultant with PartyLite, and during that telephone call on August 2, 2017, Graham recommended that prior to making a final decision, Ricca review Plaintiff's performance history to ensure that Fennimore was the best candidate to grow Ricca's well-established and profitable lineage. *Id.* at ¶¶ 31 and 32. Indeed, Kane testified that during the telephone call with Ricca, Graham explained that Ricca should "do some homework," so that she put her team and her income "in the hands of someone who will take care of that, try to grow that, and you'll earn […] income off that, off what you built." Pl. SOMF ¶ 31 (citing Schall Cert., Ex. A, Kane Dep. at 35:1-4 and 36:7-12); Def. SOMF ¶ 32. Ricca agreed to resume her conversation regarding her Designee and the Transition Plan with Graham and Kane following PartyLite's annual conference. Def. SOMF ¶ 33.

On August 15, 2017, following the annual conference, Graham expressed concern to Kane and Angela Reckley, a PartyLite Business Development Manager, about Fennimore assuming the role of Ricca's Designee based upon her age. Pl. SOMF ¶ 41. Specifically, Graham wrote in an email to Kane and Reckley that "[Plaintiff is] also 'older' which concerns me regarding a 10 year plan." *Id.* (citing Schall Cert., Ex. 5, August 15, 2017 Email.) That same day, Graham also provided Ricca with Plaintiff's sales statistics and recent performance history. Def. SOMF ¶¶ 34-

4

35. The statistics showed that Plaintiff had only one sponsor, was not consistently bonusing, and had substantially lower personal and unit sales than Ricca had anticipated. *Id.* at ¶¶ 35, 51. Following her review of the sales data, it is undisputed that Ricca proposed two other potential Designees: (1) Kim Yanuskiewicz ("Yanuskiewicz") and (2) Kim DiLeo ("DiLeo").[4] *Id.* at ¶ 41. The parties also agree that neither Yanuskiewicz nor DiLeo were suggested by PartyLite. *Id.* at ¶ 42. Rather, Ricca proposed them, in part, because they were located on the East Coast, and therefore, they could attend meetings with her team in-person. *Id.* at ¶ 44. In addition, when Ricca suggested these new consultants, Graham provided Ricca with the same bonus, sponsoring, and leader promotion data for Yanuskiewicz and DiLeo that PartyLite provided for Fennimore. *Id.* at ¶ 48. With respect to Yanuskiewicz, who was an SRVP at the time, she had the best performance record compared to Fennimore and DiLeo, and, more specifically, her personal sales, personal sponsoring, unit sponsoring, and unit sales for 2017 were higher than Plaintiff's for that same year.[5] *Id.* at ¶¶ 51 and 54.

On September 12, 2017, Ricca asked Yanuskiewicz if she would be her Designee -- a proposal that Yanuskiewicz accepted and PartyLite later approved. *Id.* at ¶ 66; Pl. SOMF ¶ 47. One week later, on September 18, 2017 and September 21, 2017, Ricca and Yanuskiewicz signed their respective Ambassador and SRVP Appointment Agreements with PartyLite, making Ricca's SRVP Transition Plan effective as of November 1, 2017. Pl. SOMF ¶ 49.

On June 11, 2019, Plaintiff, who was 60 years old at the time Ricca selected Yanuskiewicz as her Designee, filed a two-count Complaint against Defendants in the Superior Court of New

---

[4] While it is undisputed that after reviewing Fennimore's sales figures Ricca never proposed Fennimore as her Designee again, Plaintiff claims that this was because PartyLite had made it clear to Ricca that it would not approve Plaintiff as Ricca's Designee.

[5] As discussed, *infra*, the ages of Yanuskiewicz and DiLeo are unknown.

Jersey, Mercer County, asserting claims of age discrimination in violation of N.J.S.A. 10:5-12(l) and breach of implied contract.  *See* ECF No. 1.  Thereafter, Defendants removed the action to this Court based on diversity jurisdiction pursuant to 28 U.S.C. § 1332(a).  *Id.*  On January 15, 2021, Defendants filed the instant Motion for Summary Judgment.  ECF No. 25.

## II. <u>LEGAL STANDARD</u>

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable [factfinder] could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248.  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002).

The party moving for summary judgment has the initial burden of showing the basis for its motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial." *Id.* at 331.  On the other hand, if

the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id.* Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley*, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

### III.   DISCUSSION

In the instant Motion for Summary Judgment, Defendants move to dismiss Plaintiff's age discrimination claim under the NJLAD and her claim for breach of implied contract.

### A. New Jersey Law Against Discrimination

In Count I, Fennimore alleges that PartyLite discriminated against her as an independent contractor under N.J.S.A. § 10:5-12(l), based on her age by refusing to enter into a contract with her to be Ricca's Designee under the SRVP Transition Plan. Defendants argue that summary judgment should be granted in their favor because (1) PartyLite never refused to contract with Fennimore, and (2) to the extent the Court finds that PartyLite refused to contract with Fennimore, no evidence exists that the Designee decision was "because of" Fennimore's age. (Def. Moving Br. at 6-7.) In that regard, Defendants contend that Ricca, not PartyLite, selected Yanuskiewicz to be her Designee and Ricca was not influenced or persuaded by anyone at PartyLite to select Yanuskiewicz. (*Id.* at 7-9.) Moreover, Defendants submit that no evidence exists to suggest that age was a factor in Yanuskiewicz becoming Ricca's Designee. (*Id.* at 10-11.) Rather, Defendants highlight that not only was Ricca older than Plaintiff and Yanuskiewicz's age is unknown, but it is undisputed that Yanuskiewicz was superior to Fennimore by all performance metrics. (*Id.* at 11-13.) In response, Plaintiff argues that summary judgment should be denied because evidence exists in the record of age-based animus toward Plaintiff on the part of Defendants' upper management, including Graham and Kane, and further, evidence exists of a direct causal connection between that animus and the ultimate decision reached to deny Plaintiff the opportunity to enter into a contract to become an SRVP. (Pl. Opp. Br. at 9-22.) In other words, Plaintiff argues that evidence exists to suggest that Graham and other members of PartyLite's management influenced Ricca's decision to select Yanuskiewicz as her Designee, because given Plaintiff's age, PartyLite doubted her ability to work for the entirety of the ten-year transition period. I agree with Defendants' position.

N.J.S.A. 10:5-12(l) makes it unlawful "for any person to refuse to buy from, sell to . . . contract with . . . or otherwise do business with any person on the basis of . . . age . . . ." In other words, this provision of the NJLAD prohibits age discrimination in a business-to-business setting. *See Rubin v. Chilton*, 359 N.J. Super. 105, 111 (App. Div. 2003). While there are few cases construing this section of the NJLAD, courts have recognized that it "prohibits refusals to do business with independent contractors based on age, sex, or handicap." *J.T.'s Tire Serv., Inc. v. United Rentals N. Am., Inc.*, 411 N.J. Super. 236, 240 (App. Div. 2010) (citing *Nini v. Mercer County Cmty. Coll.*, 406 N.J. Super. 547, 557 (App. Div.), *certif. granted*, 200 N.J. 206 (2009); *Rubin*, 359 N.J. Super. at 110–11; *Horn v. Mazda Motor of Am., Inc.*, 265 N.J. Super. 47, 63 (App. Div.), *certif. denied*, 134 N.J. 483 (1993)). Thus, to succeed on her claim, Fennimore must prove that PartyLite refused to contract with her "because of" her age. *See CPM Consulting LLC v. Capsugel US LLC*, No. 19-16579, 2020 WL 5627216 at *6 (D.N.J. Sept. 21, 2020) (quoting *Rubin*, 359 N.J. Super. at 110); *see also Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 176 (2009) (in age discrimination claims the "plaintiff must prove that age was the 'but-for' cause" of the adverse decision). Notably, when asserting a claim under N.J.S.A. 10:5-12(l), a plaintiff is not required to set forth a *prima facie* discrimination claim. *See*, *e.g.*, *Rubin*, 359 N.J. Super. at 111; *J.T.'s Tire Serv., Inc.*, 411 N.J. Super. at 240-41.

First, no reasonable jury could find that PartyLite refused to contract with Plaintiff. Based on the undisputed evidence in the record, Ricca, not PartyLite, selected Yanuskiewicz as her Designee. As a matter of corporate policy, it is undisputed that the Transition Plan provides that the outgoing SRVP, in this case Ricca, had the right to choose her Designee, subject to the approval of PartyLite. Schall Cert., Ex. 1, Transition Plan. This is also consistent with Ricca's testimony, in which she unequivocally and emphatically confirmed that she selected Yanuskiewicz as her

9

Designee, stating: "[N]ot one soul on the face of this earth played a role in [the decision to select Yanuskiewicz], other than my husband, when we sat down and discussed it." Def. SOMF ¶ 68 (citing Schall Cert., Ex. B, Ricca Dep. at 66:19 to 67:4). The record is also clear that although Ricca may have initially believed Plaintiff was a "great choice," she later reconsidered that selection upon review of Fennimore's performance record. Indeed, Ricca testified that she understood the importance of her Designee decision, because the success of her Designee would directly impact her own financial well-being in retirement, stating: "I built a huge business. And when I'm getting ready to retire, even though I am married and I have a husband, I was the sole supporter of our family. I need to make sure that my -- that my retirement is going to at least be sufficient, or I have to protect that." Schall Cert., Ex. B, Ricca Dep. at 56:8 to 14. Ricca further testified that once she had the opportunity to review Fennimore's performance record -- information that she was not privy to prior to her initial proposal -- she realized that Yanuskiewicz was the superior option: "When I learned what [Plaintiff's] numbers were or weren't, that changed everything for me." *Id.* at 56:14 to 16. Indeed, Ricca explained that she did not "want a sideline coach." Rather, she wanted "somebody in there, playing the game," and she "didn't see that happening [with Plaintiff]." *Id.* at 56:23 to 25. Thus, once she reviewed Plaintiff's performance history, including her personal sales numbers, her personal sponsoring statistics, and her annual sales figures, she testified that the information "[c]hanged everything for me, in my decision." *Id.* at 56:23 to 57:1 (emphasis added). Finally, when PartyLite conducted its own independent investigation related to Ricca's Designee decision, Ricca supplied a written statement affirming that she was solely responsible for Yanuskiewicz's selection. Def. SOMF ¶ 74 (citing Schall Cert., Ex. B, Ricca Dep. at Ex. L-1) ("It was my decision to have Kim [Yanuskiewicz] take over my Region when I transition on November 1st.").

To the extent that Plaintiff attempts to proceed under a "cat's paw" theory of liability because she cannot prove that PartyLite was the actual decision-maker responsible for selecting Yanuskiewicz as Ricca's Designee, the Court finds that theory equally unavailing. Under a cat's paw theory, which derives its name from one of Aesop's fables, *see Staub v. Proctor Hosp.*, 562 U.S. 411, 415 n.1 (2011), an "employer is at fault because one of its agents committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment decision." *Id.* at 421. The cat's paw theory originated, in the context of mixed-motive discrimination claims. *See id.*; *see also Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 330 (3d Cir. 2015); *McKenna v. City of Phila.*, 649 F.3d 171, 176-80 (3d Cir. 2011). And there, liability may rest on the animus and actions of an immediate supervisor, regardless of the motivation of the ultimate decision-maker. *See Staub*, 562 U.S. at 422; s*ee also Jones*, 796 F.3d at 330. I note, however, that no court has applied the cat's paw theory of liability in a business-to-business refusal to contract case under N.J.S.A. § 10:5-12(l). Nonetheless, Plaintiff's NJLAD claim cannot succeed under such a theory because no reasonable jury could conclude that age animus was the proximate cause of Ricca's decision to select Yanuskiewicz. *Afrasiabipour v. Pennsylvania Dep't of Transportation*, 469 F. Supp. 3d 372, 387 (E.D. Pa. 2020) (finding that to survive summary judgment, Plaintiff must establish: (1) a genuine issue of material fact concerning the bias of the alleged actor; and (2) a genuine issue of material fact as to whether the proffered reason for the adverse action is pretextual, which requires Plaintiff to demonstrate a causal relationship between the allegedly biased actor's action and the adverse action).

Here, the <u>only</u> evidence in the record of age-based animus that Plaintiff cites is the August 15, 2017 email, in which Graham wrote that Plaintiff's age "concern[ed]" her regarding a ten-year

transition plan.[6] I agree with Defendants, however, that this type of "stray remark" by a non-decision-maker is insufficient, without more, to survive summary judgment. *Ezold v. Wolf, Block, Shcorr and Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992) (finding that "[s]tray remarks by non-decisionmakers . . . are rarely given great weight . . ."); *see also Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 521 (3d Cir. 1997); *Connolly v. Pepsi-Bottling Group, L.L.C.*, No. 06-1462, 2008 WL 4412090, at *12-13 (W.D. Pa. Sept. 22, 2008) ("No decisions of the court of appeals were found holding that stray remarks, standing alone, could reasonably be viewed as sufficient to . . . defeat summary judgment"). When considering stray remarks, the Court takes the following factors into account: "(1) the relationship of the speaker to the employee and within the corporate hierarchy; (2) the temporal proximity of the statement to the adverse employment decision; and (3) the purpose and content of the statement." *McEady v. Camden Cty. Police Dep't*, No. 16-1108, 2019 WL 4926887, at *6 (D.N.J. Oct. 7, 2019) (citing *Parker v. Verizon Pa., Inc.*, 309 F. App'x 551, 559 (3d Cir. 2009)). Here, the purpose and content of the statement are critical. No evidence exists that Ricca ever received the August 15, 2017 email; Graham and Kane testified that they have no knowledge of Yanuskiewicz's age;[7] Ricca, not Graham or Kane, suggested Yanuskiewicz and DiLeo as potential Designees, and more importantly, Ricca testified that she based her decision

---

[6] There is no evidence that this email was shared with Ricca, nor that any age based remarks about Fennimore were communicated to Ricca prior to her choosing Yanuskiewicz over Plaintiff. Indeed, Plaintiff concedes that none of Ricca's conversations with Graham and Kane involved age. Def. SOMF ¶ 91.

[7] Plaintiff's age discrimination claim suffers from an additional flaw: Plaintiff has failed to establish Yanuskiewicz's age. Indeed, it is unknown whether Yanuskiewicz is younger than Plaintiff, and even if she is younger, it is unclear how much younger. *See Narin v. Lower Merion Sch. Dist.*, 206 F.3d 323, 333 n. 9 (3d Cir. 2000) (holding that where the plaintiff was 56 and another job applicant was 49, the other applicant's age did "not differ materially from [plaintiff's]," meaning that "we cannot conclude that [defendant] ultimately filled the ... positions with someone sufficiently younger to permit an inference of discrimination").

12

on Plaintiff's poor performance record, not her age. Plaintiff submits no evidence to contradict those critical pieces of evidence.

Instead, with respect to performance, Plaintiff admits that Yanuskiewicz, who was one of PartyLite's most decorated consultants, significantly outperformed her at the time of Ricca's decision. Schall Cert., Ex. A, Fennimore Dep. at 304:20 to 307:17. And, unlike Plaintiff, Yanuskiewicz was an SRVP, which places Yanuskiewicz on a higher leadership level. Def. SOMF ¶ 54. Moreover, the sales and other performance metrics objectively confirm Yanuskiewicz's work-based superiority. While Plaintiff had developed fourteen leaders on her team, recorded $11,734 in yearly personal sales and $17,955 in yearly unit sales through September 2017, and totaled $623,136 in yearly lineage sales, Yanuskiewicz had developed thirty-three leaders, generated $29,403 in yearly personal sales and $147,457 in yearly unit sales, and amassed more than twice as much in lineage sales ($1.3 million). *Id.* at ¶¶ 55-58. Indeed, through September 2017, Yanuskiewicz had sponsored six leaders and her unit had sponsored twenty-nine leaders, while Plaintiff and her unit, on the other hand, sponsored only one leader, respectively. *Id.* at ¶¶ 59-60.

Significantly, Ricca's testimony demonstrates that the decision to select Yanuskiewicz was hers, hers alone, and was not motivated or influenced by Plaintiff's age:

> That was my decision, to say that – when I tell you the shock and awe of what I heard, and I'm going to hand over my 27-year organization to someone not bonusing? Not sponsoring? Not doing anything? That's not happening. Made my decision right then and there.
>
> [ . . . ]
>
> I had a serious problem, learning that someone was going to take what I worked, left my family, my home, drove my car, all these destinations, meeting after meeting, [Fennimore] wasn't at these meeting, she wasn't flying to meetings. I was the RVP, she was not. I paid the dues . . . I now have a choice to decide, after all these

13

> years, that my husband and I sat down and made a decision to say who's going to – what's going to work out better here? And certainly, in my business, it is effort for effort, effort for effort. And if you are not putting the effort out, don't expect a return; it's not coming to you . . . People's actions is what earns an RVP income, not words. [Fennimore's] [a]ctions were not there.

Schall Cert., Ex. B, Ricca Dep. at 66:20 to 67:4, 68:5 to 69:2. Accordingly, at best, Graham's comment in the August 15th email was an isolated remark that was never viewed by the decisionmaker and never considered in Ricca's selection of Yanuskiewicz. Thus, because no reasonable jury could conclude that PartyLite refused to contract with Plaintiff or that Ricca's decision to select Yanuskiewicz as her Designee was in any way based on Plaintiff's age, Count I is dismissed with prejudice.

### B. Breach of Implied Contract

PartyLite also argues that Fennimore's breach of implied contract claim in Count II fails as a matter of law because no valid contract existed between Fennimore and PartyLite, and further, PartyLite did not fail to perform any purported obligations under the alleged contract. (Def. Moving Br. at 17.) Plaintiff, on the other hand, argues that the Transition Plan is an enforceable implied contract, because it sets forth "comprehensive and definite provisions," including 1) specifying the required eligibility qualifications for both the Transitioning SRVP and her Designee; 2) the "specified process" to be followed by a retiring SRVP in selecting her Designee; and 3) the compensation schedule covering the Transition Plan's ten-year period. (Pl. Opp. Br. at 36-37.) Plaintiff contends that a reasonable jury could conclude that Defendants breached the Transition Plan based on their alleged circumvention of the Designee selection process. (*Id.* at 38.) Specifically, Plaintiff highlights that once Ricca announced Fennimore as her first option as Designee, PartyLite should have conducted an interview with Plaintiff, conducted a review "with [Plaintiff's] downline and upline lineage," and provided Plaintiff with some "company sanctioned

14

training and business involvement." (*Id.* at 22.)  However, because Defendants did not follow through with those procedures, Fennimore argues they breached the Transition Plan. (*Id.*)

Success on a breach of implied contract claim under New Jersey law requires "every element of a contract to be proved: mutual assent, consideration, legality of object, and capacity of the parties." *Duffy v. Charles Schwab & Co.*, 123 F. Supp. 2d 802, 818 (D.N.J. 2000).  Proof of an implied contract, however, is demonstrated by the "conduct of the parties showing, in the light of surrounding circumstances, their tacit understanding." *Chemo Iberica, S.A. v. Betachem, Inc.*, No. 13-4742, 2016 WL 865734, at *1 (D.N.J. Mar. 7, 2016) (quoting *Gardiner v. V.I. Water & Power Auth.*, 145 F.3d 635, 644 (3d Cir. 1998)).

Here, I find that Count II fails because no reasonable jury could conclude that an implied contract existed between Plaintiff and Defendants.  Indeed, rather than address any of the required elements to prove a breach of implied contract claim, Plaintiff opposes Defendants' motion for summary judgment only by analogizing the Transition Plan with an employee handbook or employee manual.  In that regard, Plaintiff submits that like an employee handbook, it is of no consequence that the Transition Plan was not negotiated or signed by Plaintiff.  The Court, however, disagrees with this comparison.  First, it cannot be ignored that the Transition Plan exists within the context of an employer-consultant relationship, not an employer-employee relationship.  Second, it is undisputed that the Transition Plan, unlike an employee handbook, which typically is distributed to all employees, is not distributed to all consultants. *See Woolley v. Hoffmann-La Roche, Inc.*, 99 N.J. 284, 305 (1985) ("In most of the cases involving an employer's personnel policy manual, the document is prepared without any negotiations and is voluntarily distributed to the workforce by the employer.").  In fact, the Transition Plan was only made available to SRVPs, and because Plaintiff was not an SRVP, the Transition Plan was not distributed to her, nor was it

even available to her.  *See* Def. SOMF ¶¶ 20-21.  It is inconceivable that a jury could find that the Transition Plan constituted a contract between Plaintiff and Defendants, where the very terms of the plan excluded Plaintiff's participation.

Additionally, even if the Transition Plan could be considered an implied contract, no reasonable jury could find that Defendants failed to perform any of their purported obligations under the plan.  As discussed in detail above, *infra*, while Ricca initially proposed Plaintiff as her Designee, she reconsidered that choice after reviewing the performance data and discussing the impact of her Designee selection on her retirement more fully with her husband.  Following a review of Fennimore's performance history, Ricca, on her own accord, suggested Yanuskiewicz and DiLeo.  After reviewing Yanuskiewicz and DiLeo's performance history, and comparing those statistics and metrics to Fennimore's record, Plaintiff ultimately selected Yanuskiewicz to be her Designee.  Because it is undisputed that Plaintiff was not Ricca's final choice, Defendants were not obligated to interview Fennimore or review her qualifications, and therefore, they did not breach the terms of the Transition Plan.  Thus, Count II is dismissed with prejudice.

### IV.  <u>CONCLUSION</u>

For the reasons set forth above, Defendants' motion for summary judgment is **GRANTED**.


Dated: August 17, 2021                                          /s/ Freda L. Wolfson
                                                                                                       Freda L. Wolfson
                                                                                                       U.S. Chief District Judge